USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___12/7/2022_____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

W.R. and A.R., on behalf of N.R.,

                         Plaintiffs,

        -against-

KATONAH LEWISBORO UNION FREE SCHOOL
DISTRICT,

                         Defendant.

No. 21 Civ. 883 (NSR)

**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge

    Plaintiffs W.R. and A.R. (the "Parents"), on behalf of their son N.R., bring this action against the Katonah Lewisboro Union Free School District ("Defendant" or "the District") pursuant to the Individuals with Disabilities Education Improvement Act ("IDEA" or "IDEIA"), 20 U.S.C. § 1400 *et seq.*, and Article 89 of the New York State Education Law.  Plaintiffs seek, *inter alia*, judicial review of a decision made by a State Review Officer ("SRO") at the New York State Department of Education, who affirmed in part and reversed in part the decision of an Impartial Hearing Officer ("IHO").  The SRO decision found the District had offered N.R. a free and appropriate public education ("FAPE") for the 2017–2018 and 2018–2019 school years and thus denied Plaintiff's request for tuition reimbursement associated with a private school placement during those school years.

    Before the Court is Plaintiffs' motion (ECF No. 24) and Defendant's cross-motion (ECF No. 30) for summary judgment.  For the reasons set forth below, Plaintiffs' motion is DENIED, and Defendant's motion is GRANTED.  The SRO's decision is AFFIRMED.  Plaintiff's claims asserted against the District pursuant to the IDEA are DISMISSED.

**BACKGROUND**

I.     **Factual Background**

The parties have submitted briefs, statements of material facts pursuant to Local Civil Rule 56.1, and the record and exhibits from the proceedings below,[1] which reflect the following factual background.[2]

A.     **Plaintiffs' Due Process Complaint**

N.R. resides in the District (Def. 56.1 at ¶ 68), located in Westchester County, New York, but his parents enrolled him at Winston Preparatory School ("Winston" or "WPS"), located in Norwalk, Connecticut (Def. 56.1 at ¶¶ 68, 69).  Plaintiffs, on behalf of their disabled child N.R., filed a Due Process Complaint, also known as an Impartial Hearing Demand, against the District on April 26, 2019.  (C.R. IHO Ex. 1.)  Plaintiffs cited federal claims under the IDEA, 20 U.S.C. § 1400 *et seq*.  (*See generally* C.R. IHO Ex. 1; IHO Decision at 2.)  Plaintiffs requested an impartial hearing on whether N.R.'s 2017–2018 and 2018–2019 school years' Individualized Education Programs ("IEP") were inappropriate and failed to offer a free and appropriate public education ("FAPE"), whether N.R.'s placement at Winston was appropriate for the 2017–2018 and 2018–2019 school years, and whether Plaintiffs were entitled to tuition reimbursement for Plaintiffs'

_____

[1] Plaintiffs' motion was fully briefed as of October 1, 2021.  (*See* Pls. Mot. Summ. J. ("Pls. Mot."), ECF No. 24; Pls. Mem. Supp. Pls. Mot. ("Pls. Mem."), ECF No. 25; Pls. R. 56.1 Statement ("Pls. 56.1"), ECF No. 26; Def. Opp'n to Pls. Mot. ("Def. Opp'n"), ECF No. 33; Def. Resp. to Pls. 56.1 ("Def. Resp. 56.1"); Pls. Reply Mem. Supp. Pls. Mot. ("Pls. Reply"), ECF No. 36.)  Defendant's cross-motion for summary judgment was also fully briefed as of October 1, 2021.  (Def. Mot. Summ. J. ("Def. Mot."), ECF No. 30; Def. Mem. Supp. Def. Mot. ("Def. Mot."), ECF No. 31; Def. R. 56.1 Statement ("Def. 56.1"), ECF No. 32; Pls. Opp'n to Def. Mot. ("Pls. Opp'n"), ECF No. 34; Pls. Resp. to Def. 56.1 ("Pls. Resp. 56.1"), ECF No. 28; Def. Reply Mem. Supp. Def. Mot. ("Def. Reply"), ECF No. 38.)  A certified hard copy of the administrative hearing record that was before the State Review Officer (the "Certified Record") was received by the Court by mail on June 23, 2021.  The Certified Record was filed at ECF No. 22.

[2] For ease of reference, citations prefixed by "C.R." refer to the Certified Record before the Court containing the relevant exhibit or hearing testimony from the certified transcript.  Referenced exhibits prefixed by "D-" refer to the District's exhibits and those prefixed by "P-" refer to Plaintiffs' exhibits introduced at the impartial hearing.  Exhibits introduced by the IHO are prefixed with "IHO Ex."  Hearing testimony is followed by the witness's last name.

unilateral placement of N.R. at Winston during the 2017–2018 and 2018–2019 school years.  (C.R. IHO Ex. 1 at 9–10.)

## B.    Record Adduced at Hearing before the IHO

An impartial hearing before an IHO was held to determine the merits of Plaintiffs' claims, including the appropriateness of the IEPs provided by the District.  (*See generally* IHO Decision.) The impartial hearing lasted for eight days over a period spanning five months, beginning on October 23, 2019, and ending on March 4, 2020.  (*See* IHO Decision at 1.)  Plaintiffs were represented by counsel at the hearing.  (*See generally id.*)  Five witnesses testified during the hearing on behalf of the District: David Feller, the District's Interim Director of Special Services; Sean Murphy, a middle school special education teacher employed by the District; Katrina Costello, a reading instructor employed by the District; Michelle Mancinelli, a high school special education teacher employed by the District; and Jennifer Lovallo, a psychologist employed by the District.  Six witnesses testified on behalf of Plaintiffs: Plaintiff A.R., N.R.'s mother; Steven Sommovigo, a special and general education instructor employed by Winston; Dr. Jeanne Dietrich, a child psychologist; Dr. Carole Fiorile, a behavior analyst; Erin Bennedum, a "Focus" instructor employed by Winston; and Jordan Yannotti, Winston's dean.[3]  (*See generally id.*)  The Court summarizes the salient portions of the documentary and testimonial evidence below, referring to the IHO's summary and specific record citations as needed.

### 1.    Background

N.R. is now an eighteen-year-old student residing within the District who has been classified as a student with a disability by the District's Committee on Special Education ("CSE").  (Pls. 56.1 ¶¶ 2, 3, 15; C.R. Ex. D-11 at 1.)  In elementary school, N.R. was diagnosed

---

[3]  The transcripts of the testimony alone constituted over 1,000 pages.  Additionally, numerous exhibits were presented by the parties and received into evidence.  *See generally* ECF No. 22.

with Attention Deficit Hyperactivity Disorder ("ADHD"), dyslexia, dysgraphia, and learning deficits related to reading, mathematics, working memory, executive functioning, and mental stamina. (Pls. 56.1 ¶ 14; C.R. Ex. D-7 at 11–12, 14.) N.R. last attended a District school during the 2014–2015 school year (his fifth-grade year). (Pls. Resp. 56.1 at ¶ 8.) His parents rejected the IEP developed by the CSE for the 2015-2016 school year, and N.R.'s parents in turn placed N.R. at Winston for his sixth-grade year. (*Id.* at ¶ 7.) The CSE approved another IEP for the 2016-2017 school year, but N.R.'s parents again rejected the IEP and elected instead to continue N.R.'s placement at Winston for his seventh-grade year. (*Id.* at ¶ 10.) N.R. remained at Winston through the 2018–2019 school year. (Pls. 56.1 ¶ 19.)

### 2. *April 2017 Meeting and 2017–2018 IEP*

On April 28, 2017, the CSE convened for N.R.'s annual review and to develop an IEP for the 2017–2018 school year (N.R.'s eighth-grade year), (the "April 2017 Meeting"). (C.R. Ex. D-1.) The participants at the April 2017 Meeting included: David Feller, CSE Chairperson; Julianna Michaels, District psychologist; Sean Murphy, District special education teacher; Stacey Husband, District general education teacher; Jeff Tepper, District guidance counselor; David Strong, District attorney; Erin Bennedum (via phone), Winston tutorial teacher; W.R., N.R.'s father; A.R., N.R.'s mother; and Peter Hoffman, W.R & A.R.'s attorney. (*Id.* at 1.) The CSE reviewed all prior private and District evaluations of N.R., including current academic reports from Winston. (*Id.*)

Ms. Bennedum was N.R.'s "Focus Teacher" at Winston, and she regularly met N.R. for one-on-one sessions to "improv[e] decoding and encoding skills," "improv[e] written output," "organiz[e] his thoughts to improve his written input," and develop "social skills." (*Id.* at 1.) She described N.R. as an "eager learner" and "very friendly student" who struggles with the "comprehension of fine details" and reading social situations. (*Id.* at 1–2.) When asked by Mr.

Feller to identify areas that "require attention," she identified a number of examples, including N.R.'s "level of written output," "decoding and encoding," and "meta-cognitive skills in terms of better understanding himself as a learner." (*Id.* at 2.)

Mr. Feller then reviewed the 2016–2017 IEP and asked Mr. Murphy to describe the proposed 2017–2018 IEP. (*Id.*) Mr. Murphy, the District middle school's special education teacher, explained that many of his students had similar profiles to N.R.: students who have "average to above-average cognitive abilities, are capable, but . . . have struggled in academic and social areas." (*Id.*) These students learn "grade level academic skills" in a "small setting"; for example, Mr. Murphy's math classes range from two to six students. (*Id.*) In-room teaching assistants and weekly counseling sessions are offered to provide further instructional and social support to Mr. Murphy's students. (*Id.*)

Ms. Michaels discussed the program's counseling services. (*Id.*) Ms. Michaels suggested N.R. attend counseling once per week individually and once per week in a small group. (*Id.*) Based on "what she ha[d] gleaned from the meeting," Ms. Michaels commented on areas for improvement. (*Id.*) Based on N.R.'s social profile, Ms. Michaels identified goals for N.R. that would "focus on interacting appropriately when frustrated, managing social situations, and working on interactions with other students." (*Id.*)

The 2017–2018 IEP identified N.R. as a candidate for "mainstreaming." (*Id.*) In other words, the IEP directed N.R. into a science course outside of the "small setting" described by Mr. Murphy. (*Id.* at 3.) N.R.'s mother, however, was concerned that placing N.R. into a "mainstreamed" science class was premature. (*Id.* at 2–3.) In response, the CSE decided N.R. should start the 2017–2018 school year in a special education setting for science. (*Id.* at 3.) The CSE would then monitor N.R.'s progress "to see if [mainstreaming] could be a possibility." (*Id.*)

If it were, Mr. Murphy emphasized that a teaching assistant would provide individualized support to N.R. and serve as a "liaison between teachers/students" to ensure a "successful experience." (*Id.*)

N.R.'s parents raised their concerns regarding classroom size at multiple points during the meeting. (*See generally id.* at 1–4.)  They "continuously compared the environment" at Winston to the District middle school, expressing that N.R. would become "frustrated" and "more impulsive[e]" in a "larger building." (*Id.* at 3.)  N.R.'s mother also believed N.R. would struggle in larger classes "given his distractibility." (*Id.*)  Mr. Feller reiterated that special class sizes are capped at 15 students and incorporate the individualized support of teaching assistants, but N.R.'s parents were unmoved. (*Id.*)  N.R.'s parents believed the teaching assistant acts like a "babysitter" and that their presence in the classroom would "stigmatize" N.R. (*Id.*)  Ultimately, N.R.'s parents aimed to integrate N.R. "back into a mainstream school environment" but did not feel N.R. was "ready" yet. (*Id.*)

The CSE then "reviewed and updated" the IEP goals for 2017–2018. (*Id.*)  The 2017–2018 IEP listed 13 annual goals, including two goals for "study skills," three for "reading," two for "writing," three for "mathematics," and three for "social / emotional / behavioral" skills. (*Id.* at 11–13.)  Each of the thirteen goals was accompanied by criteria to measure achievement (*e.g.,* "80% success over 1 week"), methods for measuring progress (*e.g.,* "[p]ortfolio materials"), and a schedule for measuring progress (*e.g.,* "every 4 weeks"). (*Id.*)  Seven goals were copied verbatim from the 2016–2017 IEP, and five goals were similar but either added content or adjusted the criteria for achievement. (*Compare id. with* C.R. Ex. D-6 at 8–10.)

To achieve these goals, the CSE recommended an IEP with the following components: special classes for language arts, math, reading, social studies, and science, all adhering to a 15-

student cap and incorporating support from teaching assistants; individual and group counseling; movement breaks; preferential seating; visual and auditory supports; modified homework assignments; assistive technology services; and other program modifications, such as the use of a graphic organizer, scaffolded study guides, individualized directions, and copies of class notes.  (C.R. Ex. D-1 at 13–14.)

N.R.'s legal counsel, on behalf of N.R.'s parents, rejected the IEP and reserved their right to place N.R. at a private school.  (*Id.* at 4.)  N.R., now an eighth grader, attended Winston for the 2017–2018 school year.  (C.R. Ex. D-2 at 1.)

### 3. April 2018 Meeting and 2018–2019 IEP

On April 20, 2018, the CSE reconvened for N.R.'s annual review and to develop an IEP for the 2018–2019 school year (N.R.'s ninth-grade year), (the "April 2018 Meeting").[4]  (*Id.*)  The participants at the CSE meeting included: Mr.  Feller, CSE Chairperson; Jennifer Lovallo, District psychologist; Katrina Costello, District special education teacher; Rose Colaizzi, District general education teacher; Beth DeBeer, District guidance counselor; Dan Petigrow, District attorney; Dr. Kevin Kalikow, psychiatrist; Dr. Carol Fiorile (via phone), educational consultant; Jordan Yannotti (via phone), Winston's dean; W.R., N.R.'s father; A.R., N.R.'s mother; and Peter Hoffman, W.R & A.R.'s attorney.  (*Id.* at 1.)  As it did at the April 2017 Meeting, Winston provided the CSE with updated academic reports from N.R.'s eighth grade year.  (*Id.*)

Mr. Yannotti introduced himself as Winston's dean and commented on N.R.'s progress since the April 2017 Meeting.  (*Id.*)  He observed "significant gains" in N.R.'s academic and social skills, and in particular, he noted that N.R. responded well to one-on-one feedback designed to

---

[4] The CSE concluded—as it did in prior IEPs—that N.R. should continue to be designated as a student with an "Other Health Impairment."  (C.R. Ex. D-2 at 3)  The designation followed a review of "available data, including input from school and parents."  (*Id.*)  All participants were in agreement.  (*Id.*)

address "specific executive functioning challenges," such as time management and attention to detail. (*Id.* at 2.) N.R. progressed across all academic subjects, but Mr. Yannotti and Mr. Feller both added N.R. still required support in a number of areas. Math fluency and reading comprehension were noted as areas requiring "special education," and Mr. Yannotti identified "writing," "decoding skills," and "reading fluency/accuracy" as additional "areas of weakness." (*Id.*) Mr. Yannotti also indicated N.R. needed to "better navigate cooperative learning situations with peers" and "improve self-monitoring of off-topic comments." (*Id.*) "Updated goals" were designed to "address these areas." (*Id.*)

Before the IEP was presented and discussed, N.R.'s parents raised their concerns regarding N.R.'s ability to "effectively function in a regular public school." (*Id.* at 3.) They believed the "smaller size" at Winston was more conducive to N.R.'s needs, and they worried a large public high school "would cause his impulsivity and attention to be negatively impacted." (*Id.*) Although N.R.'s parents expressed their desire for N.R. to transition back to the District, they thought the transition "would be completely overwhelming." (*Id.*) N.R. was not "ready," and his parents also explained their fear that the District would "retain," or hold back, N.R. at a lower grade level. (*Id.* at 3–4.)

The CSE responded to these concerns. Mr. Feller explained how the CSE could continue the special education classes prescribed in the 2017–2018 IEP, and he described the variety of special education options at the ninth grade level. (*Id.* at 4.) These options were designed to cater to each student's individual needs while adhering to the New York State's ninth grade curriculum. (*Id.*) For example, the District high school offered integrated co-teach classes in science and mathematics, which were taught by both a general education and special education teacher. (*Id.*) Mr. Feller also emphasized that special education classes were capped at 15

students, who were accompanied by a teacher and teaching assistant.  (*Id.*)  These classes often held fewer students than the 15-student maximum cap.  (*Id.*)  In addition to limited class size, Mr. Feller stressed that special education classes entailed targeted support for each individual student's IEP goals.  (*Id.*)

Mr. Feller then suggested an avenue for personalizing N.R.'s experience in special education.  Although the 2017–2018 IEP called for N.R. to enroll in special education classes for all academic subjects, Mr. Feller, "upon reflection," expressed that N.R. "would benefit from the Integrated Co-Teach model" for earth science.  (*Id.*)  Noting N.R.'s success and interest in the subject, Mr. Feller believed the co-teach class provided an opportunity for N.R. "to have more integration with general education peers."  (*Id.*)  Mr. Feller reiterated that N.R. would still receive individualized support on a daily basis.  (*Id.*)

Ms. Lovallo then discussed how the IEP would address N.R.'s social skills.  She explained that the District high school offered five social skill peer groups, as determined by each student's respective IEP.  (*Id.*)  Based on comments from N.R.'s parents and Mr. Yannotti, Ms. Lovallo identified "social pragmatic skills" as the appropriate placement, and she recommended N.R. participate in a weekly social skills group counseling session.  (*Id.*)  Ms. Lovallo also proposed individual counseling for N.R., and N.R.'s mother agreed such counseling "would be beneficial."  (*Id.*)  All parties ultimately agreed that N.R. would participate in individual and group counseling on a weekly basis.  (*Id.*)

The meeting resulted in a number of modifications to the existing IEP.  For example, after N.R.'s mother expressed concern that N.R. could feel self-conscious using assistive technology, *e.g.,* FM system, in a high school setting, the CSE left the FM system off the IEP and indicated it would reassess based upon feedback from N.R. and his teachers.  (*Id.* at 5.)  Later in the meeting,

Ms. Lovallo suggested providing "books on tape" to N.R.; N.R.'s mother agreed, and the CSE added audiobooks to the IEP. (*Id.*) Mr. Feller also raised again the possibility of N.R. taking an integrated co-teach class in science. (*Id.*) He reiterated the class provided a "mainstream course" "compatible with [N.R's] interests." (*Id.*) The class provided "more hands-on opportunities with labs," added Ms. Lovallo, and referencing the earlier feedback from N.R.'s parents regarding N.R.'s self-esteem, Mr. Feller suggested that the class "might be good for [N.R.'s] self-esteem and provide a good balance." (*Id.*)

Unlike the April 2017 Meeting, at no point during the April 2018 Meeting did the participants explicitly review the annual goals listed in the 2018–2019 IEP. (*See generally id.* at 1–5.) The 2018–2019 IEP listed 18 annual goals, including seven goals for "study skills," three for "reading," two for "writing," three for "mathematics," and three for "social / emotional / behavioral" skills. (*Id.* at 16–18.) Each of the eighteen goals were again accompanied by criteria to measure achievement and methods and a schedule for measuring progress. (*Id.*) Seven goals were copied verbatim from the 2017–2018 IEP, four goals were similar but either added content or adjusted the criteria for achievement, and seven goals were new. (*Compare id. with* C.R. Ex. D-1 at 11–13.)

In sum, the CSE recommended an IEP largely unchanged from the 2017–2018 IEP. (C.R. Ex. D-2 at 5, 19–21.) The 2018–2019 IEP recommended an integrated co-teach class in Earth Science as a "mainstream opportunity" for N.R. (*Id.* at 5.) The IEP also incorporated regular communication with N.R.'s parents to provide feedback and added "books on tape" as an available resource to N.R. (*Id.* at 19–20.)

10

N.R.'s legal counsel, on behalf of N.R.'s parents, again rejected the IEP and reserved the Parents' right to reimbursement for tuition expenses incurred in placing N.R. at Winston.  (*Id.* at 6.)

### C.    IHO Decision

Following the impartial hearing held across eight days between October 2019 and March 2020, the IHO issued a 55-page decision dated June 24, 2020.  (*See generally* IHO Decision.)  The IHO granted in part and denied in part the Parents' application for tuition reimbursement.  (*Id.* at 54–55.)

The IHO concluded that the District "fell short of its mandate to provide [N.R.] with FAPE."  (*Id.* at 55.)  In so doing, the IHO determined that the District "failed to discuss or draft meaningful goals," thus "marginaliz[ing] the Parents' participation in this component of the proceedings."  (*Id.* at 54–55.)  The IHO acknowledged, however, that this failure did not represent a "substantial violation of the District's mandate."  (*Id.* at 54.)  With respect to the District's mandate to provide N.R. with FAPE, the IHO found no other violations: the CSE did not engage in impermissible predetermination of N.R.'s IEPs (*id.* at 47), considered sufficient evaluative information (*id.* at 33–34, 43), and drafted an IEP appropriate and sufficient to address N.R.'s needs (*id.* at 34–34, 43–44).

The IHO also concluded Winston was an appropriate unilateral placement for N.R. for the 2017–2018 and 2018–2019 school years.  (*Id.* at 50.)  The IHO, however, found that equitable considerations warranted a reduction of any tuition reimbursement.  (*Id.* at 54.)  These considerations included the appropriateness of the District's IEP and apparent single-mindedness of the Parents to unilaterally place N.R. at Winston.  (*Id.* at 51–54.)  The Parents were thus entitled to only $10,000 total in tuition reimbursement for the 2017–2018 and 2018–2019 school years.

(*Id.* at 55.)

     **D.**     **SRO Decision**

     The Parents and the District both sought review of the IHO's decision. The District appealed the IHO's conclusion that the District failed to provide N.R. with a FAPE for the 2017–2018 and 2018–2019 school years. (*See generally* C.R. Defendant's Verified Request for Review ("Def. SRO Appeal").) In particular, Defendant argued the IHO erred in determining that (1) the District deprived the Parents of meaningfully participating in the development of annual goals at the April 2017 and April 2018 Meetings and (2) the April 2017 and April 2018 CSEs failed to develop meaningful and measurable annual goals to address N.R.'s needs. (*Id.* at ¶ 3.) The District also appealed the IHO's conclusion that Winston was an appropriate unilateral placement. (*Id.*) Lastly, the District argued the IHO incorrectly weighed its equitable considerations and thus erred in not denying the Parents' request for tuition reimbursement in its entirety. (*Id.* at ¶ 4.)

     The Parents filed a cross-appeal arguing that the IHO erred by (1) not addressing whether the testimony of District teacher witnesses was impermissibly "retrospective"; (2) not finding the District had pre-determined N.R.'s programs and placements for the 2017–2018 and 2018–2019 school years; and (3) reducing Plaintiff's tuition reimbursement based on equitable considerations, including IHO's finding that the District's IEP was only partially inappropriate and that the Parents were unwilling to place N.R. at a District school. (C.R. Plaintiffs' Answer and Appeal at ¶ 1 ("Pls. SRO Appeal").)

     The SRO reversed the IHO's determination that the CSE's "lack of discussion of annual goals or the repetition of annual goals from prior IEPs resulted in a denial of a FAPE" to N.R. (SRO Decision at 21.) Instead, the SRO concluded that "the evidence in the hearing record establishes that the [D]istrict offered the student a FAPE for the 2017–18 and 2018–19 school

years." (*Id.*)  As such, the SRO determined there was "no need" to decide whether Winston was an appropriate unilateral placement for N.R. or whether equitable considerations support an award of tuition reimbursement.  (*Id.*)

## II.    Procedural History

The Parents filed their complaint in this matter on February 1, 2021.  (ECF No. 1.)  The District filed its answer on April 7, 2021.  (ECF No. 8.)  The Parents' motion for summary judgement and the District's cross-motion for summary judgment were fully submitted, with respective oppositions, as of October 1, 2021.  (*See supra* at 2 n.1.)

## LEGAL STANDARDS

## I.    Legal Framework of IDEA[5]

The IDEA's "purpose is 'to ensure that all children with disabilities have available to them a free appropriate public education.'"  *T.K. v. New York City Dep't of Educ.*, 810 F.3d 869, 875 (2d Cir. 2016) (quoting 20 U.S.C. § 1400(d)(1)(A)).  As the Second Circuit has recently described, this means "an education 'likely to produce progress, not regression,' and one that 'afford[s] the student with an opportunity greater than mere trivial advancement.'"  *Id.* (quoting *M.O. v. New York City Dep't of Educ.*, 793 F.3d 236, 239 (2d Cir. 2015)); *accord Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1001 (2017) ("[A] student offered an educational program providing 'merely more than *de minimis*' progress from year to year can hardly be said to have been offered an education at all.").

"The 'centerpiece' of the IDEA and its principal mechanism for achieving this goal is the IEP."  *T.K.*, 810 F.3d at 875.  "The IEP is the means by which special education and related

---

[5]  The IDEA was amended by the IDEIA in 2004.  *See E.M. v. New York City Dep't of Educ.*, 758 F.3d 442, 445 n.1 (2d Cir. 2014).

services are 'tailored to the unique needs' of a particular child." *Endrew F.*, 137 S. Ct. at 994 (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 181 (1982)). The IDEA imposes upon school districts the duty to seek out children with a disability and ensure they receive the special education services they need. *See* 20 U.S.C. § 1412(a)(3); 34 C.F.R. § 300.111(a)(1)(i); *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 245 (2009). Similarly, "an educational agency must issue an IEP for a resident qualifying child, even if that child has been enrolled in a private school outside the boundaries of the school district." *Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 451 (2d Cir. 2015). And, the IEP "must be drafted in compliance with a detailed set of procedures." *Endrew F.*, 137 S. Ct. at 994 (citing 20 U.S.C. § 1414(d)(1)(B)).

"The IDEA requires that every IEP include 'a statement of the child's present levels of academic achievement and functional performance,' describe 'how the child's disability affects the child's involvement and progress in the general education curriculum,' and set out 'measurable annual goals, including academic and functional goals,' along with a 'description of how the child's progress toward meeting' those goals will be gauged." *Id.* (quoting 20 U.S.C. §§ 1414(d)(1)(A)(i)(I)–(III)). It "must also describe the 'special education and related services . . . that will be provided' so that the child may 'advance appropriately toward attaining the annual goals' and, when possible, 'be involved in and make progress in the general education curriculum.'" *Id.* (quoting 20 U.S.C. § 1414(d)(1)(A)(i)(IV)).

In addition to providing an education likely to produce progress, tailored to the unique needs of the child, the program must be offered in the least restrictive environment. 20 U.S.C. § 1412 (a)(5)(A); N.Y. Comp. Codes R. & Regs. ("N.Y.C.R.R.") §§ 200.1(cc), 200.6(a1); *see C.W.L. & E.L. v. Pelham Union Free Sch. Dist.*, 149 F. Supp. 3d 451, 467–68 (S.D.N.Y. 2015)

14

(quoting *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 145 (2d Cir. 2013)) (explaining that one of the IDEA's goals is "to provide disabled children with a public education 'while protecting them from being inappropriately sequestered in a special-education classroom'"). "[A] disabled student's least restrictive environment refers to the least restrictive educational setting consistent with *that* student's needs, *not* the least restrictive setting that the school district chooses to make available." *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 161 (2d Cir. 2014) (emphasis added and citation omitted). "This requirement 'expresses a strong preference for children with disabilities to be educated, to the maximum extent appropriate, together with their non-disabled peers.'" *Id.* (quoting *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998)) (internal quotation marks omitted in original).

"Where the IEP is substantively deficient, parents may unilaterally reject it in favor of sending their child to private school and seek tuition reimbursement from the State." *T.K.*, 810 F.3d at 875. If the services offered the student by the school district are inadequate or inappropriate, a school district will be required to reimburse parents for expenditures made for a private school placement. *See Florence Cty. Sch. Dist. Four v. Carter By & Through Carter*, 510 U.S. 7, 13–16 (1993); *Sch. Comm. of the Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369–70 (1985). Following the *Burlington/Carter* test, once a court determines that a child has been denied an appropriate educational opportunity by the public school district, the remaining considerations are "whether the parents' private placement is appropriate to the child's needs" and the balance of the equities. *C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 73 (2d Cir. 2014).

"Generally, 'the same considerations and criteria that apply in determining whether the School District's placement is appropriate should be considered in determining the appropriateness

of the parents' placement'; accordingly, the private placement must be 'reasonably calculated to enable the child to receive educational benefits.'" *Doe*, 790 F.3d at 451 (citation omitted). "Under New York law, 'the [school district] bears the burden of establishing the validity of the IEP, while the parents bear the burden of establishing the appropriateness of the private placement.'" *T.K.*, 810 F.3d at 875 (quoting *C.F.*, 746 F.3d at 76 (citing N.Y. Educ. Law § 4404(1)(c))).[6]

## II.     Exhaustion Under the IDEA

IDEA is designed to guarantee parents "both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate." *Honig v. Doe*, 484 U.S. 305, 311–12 (1988).  In particular, parents may request a due process hearing to challenge "any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education."  20 U.S.C. § 1415(b)(6)(A).  To adjudicate parents' due process claims under IDEA, New York has adopted a "'two-tier administrative system for review of IEPs': first, [a plaintiff] must seek review by an independent hearing officer; and second, [that plaintiff] must appeal any adverse result to a state review officer." *Avaras v. Clarkstown Cent. Sch. Dist.*, No. 15 CIV. 2042 (NSR), 2017 WL 3037402, at *12 (S.D.N.Y. July 17, 2017) (quoting *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 245 (2d Cir. 2008)).

Any adverse findings made by the IHO that were not appealed to the SRO "have not been exhausted and cannot be considered." *Avaras*, 2017 WL 3037402, at *13; *see C.H. v. Goshen Cent. Sch. Dist.*, No. 11 CIV. 6933 (CS), 2013 WL 1285387, at *10 (S.D.N.Y. Mar. 28, 2013) ("[T]his Court has the power to decide only those issues . . . not waived by failing to appeal or

---

[6] "It remains an open question whether states may deviate from the IDEA's default rule, as New York does, by placing the initial burden on the school board." *Reyes ex rel. R.P. v. N.Y.C. Dep't of Educ.*, 760 F.3d 211, 219 (2d Cir. 2014) (citing *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57–58 (2005)) ("[T]he Supreme Court has interpreted the statute to place the burden of challenging an IEP on the party bringing the challenge").

cross-appeal to the SRO an adverse finding by the IHO."); *see also* 8 N.Y.C.R.R. § 200.5(j)(5)(v) ("The decision of the impartial hearing officer shall be binding upon both parties unless appealed to the State review officer.").   To properly exhaust an adverse finding, a plaintiff must "clearly specify the reasons for challenging the impartial hearing officer's decision [and] identify the findings, conclusions, and orders to which exceptions are taken."   8 N.Y.C.R.R. § 279.4(f); *see M.C. v. Mamaroneck Union Free Sch. Dist.*, No. 17 CIV. 1554 (CM), 2018 WL 4997516, at *23 (S.D.N.Y. Sept. 28, 2018) (upholding SRO's dismissal of allegations set forth in appeal where appellants failed to identify the "precise rulings presented for review" and instead "parrot[ed] the language of the statute about what an IEP cannot do").   Adverse findings not so identified on appeal to the SRO are "deemed abandoned," 8 N.Y.C.R.R. § 279.8(c)(4), therein "depriv[ing] the Court of subject matter jurisdiction" over the adjudication of such findings.   *B.C. ex rel. B.M. v. Pine Plains Cent. Sch. Dist.*, 971 F. Supp. 2d 356, 365 (S.D.N.Y. 2013).

The SRO concluded that the Parents abandoned a number of objections to the IHO's findings by failing to raise them.   (SRO Decision at 6–8.)   The IHO found that the April 2017 and 2018 CSEs each (1) "considered sufficient evaluative information"; (2) developed a "classroom behavior plan sufficient to address the student's behavior needs"; and (3) "recommended an appropriate program and placement" for N.R.   (*Id.* at 7.)   Because the Parents failed to cross-appeal these adverse findings to the SRO, the SRO deemed these findings "final and binding" and refused to review them further.   (*Id.* at 8.)

The Court agrees with the SRO's determination.   The Court overturns an SRO's determination on abandonment only if the determination is "arbitrary and capricious," such that it displays a "clear error of judgment."   *Avaras v. Clarkstown Cent. Sch. Dist.*, No. 18 CIV. 6964 (NSR), 2019 WL 4600870, at *10–11 (S.D.N.Y. Sept. 21, 2019) (citing *State of N.Y. Dep't of Soc.*

*Servs. v. Shalala*, 21 F.3d 485, 492 (2d Cir. 1994)).  Here, the Court sees no reason to disturb the SRO's determination.

The Parents argue their cross-appeal submitted to the SRO "asked for relief as it concerned the district's failure to provide a FAPE," (Pls. Opp'n at 3) preserving all of the IHO's adverse findings for review.  *Cf. M.C.*, 2018 WL 4997516, at \*23 (upholding SRO's decision on abandonment where plaintiffs appealed the "IHO's determination regarding the procedural inadequacies in the development of the Student's IEP in so far as these inadequacies *impeded the Student's right to FAPE*…" (emphasis added)).  To the extent the Parents cross-appealed the "district's failure to provide a FAPE," (Pls. Opp'n at 3) the Parents fall far short of identifying "precise rulings" for review.  *M.C.*, 2018 WL 4997516, at \*23.  In their cross-appeal to the SRO, the Parents specifically challenged the IHO's "improper[ ] deduct[ion]" of tuition reimbursement, and the Parents alleged the IHO erred in allowing the "retrospective" testimony of two District witnesses and "not finding District predetermination for IEPs and placements in 2017–2018 and 2018–2019." (Pls. SRO Appeal at ¶ 1.)  A close reading of the Parents' cross-appeal reveals the Parents did not challenge the IHO's other findings as to the appropriateness of the IEPs for the 2017–2018 and 2018–2019 school years.  (*See generally* Pls. SRO Appeal at ¶¶ 1–38.)  The SRO thus did not err in deeming abandoned the following grounds for appeal: (1) sufficiency of the evaluative information; (2) sufficiency of the classroom behavior plan; and (3) appropriateness of the program and placement for N.R.[7]

---

[7] The Complaint (and the Parents' moving papers) raises several unpreserved challenges related to the "program and placement" designed for N.R.  These challenges include: concerns related to stigma (Compl. at ¶ 65), classroom size (*id.* at ¶¶ 77, 108), classroom ratio (*id.* at ¶¶ 78, 109), classroom profile (*id.* at ¶¶ 79, 110), classroom distractions (*id.* at ¶¶ 80, 111), appropriateness of the reading program (*id.* at ¶¶ 84, 115; Pls. Mem. at 18), and lack of 1:1 support period (Pls. Mem. at 18.).  These challenges are not properly before the Court.

The SRO also refused to address whether the testimony of District witnesses before the IHO was "retrospective." (SRO Decision at 7–8.) In their cross-appeal to the SRO (and now in their present motion), the Parents argue that the IHO relied upon the "impermissible" testimony of District witnesses who testified about methodologies not previously discussed at the April 2017 or 2018 Meetings or in the IEPs. (Pls. SRO Appeal at ¶¶ 1, 19–25.) In effect, "retrospective testimony" is impermissible because it "materially alter[s] a deficient written IEP" by describing services "beyond those listed in the IEP." *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 174 (2d Cir. 2012).

The Court, however, need not determine whether the testimony at issue was "retrospective"; the issue is not properly before the Court. In support of their cross-appeal, the Parents alleged that the testimony of an eighth-grade special education teacher (Mr. Murphy) was "retrospective," but the Parents pointed to no portion of the IHO's decision where the IHO relied upon the allegedly retrospective testimony. (Pls. SRO Appeal at ¶¶ 24–25; SRO Decision at 7 n.5.) The Parents also cited several pages of the IHO's decision where they assert the IHO impermissibly relied upon the retrospective testimony of a ninth-grade special education teacher (Ms. Mancinelli). (Pls. SRO Appeal at ¶ 19.) The SRO, however, reviewed these pages and found that the IHO "did not explicitly rely" on Ms. Mancinelli's testimony in finding the program and placement in the 2018–2019 IEP were appropriate. (SRO Decision at 7 n.5.) As observed by the SRO, the Parents did not "identify which findings of the IHO were impermissibly based on retrospective testimony or argue that the findings made by the IHO were not supported by sufficient permissible evidence." (SRO Decision at 7.) The Court agrees. The SRO had no obligation to "impute challenges to the IHO's decision that the parent has not clearly alleged, nor . . . research and construct the appealing party's arguments or guess what the parent may have

intended." *Davis v. Carranza*, No. 19 CIV. 10123 (AT), 2021 WL 964820, at *12 (S.D.N.Y. Mar. 15, 2021) (internal citations omitted).  The SRO therefore did not err in deeming abandoned the Parents' arguments related to retrospective testimony.

The Court now turns to the claims properly before it.

## DISCUSSION

### I.    Standard of Review

In IDEA actions, district courts follow a procedure that is in substance an appeal from an administrative determination, not a traditional summary judgment analysis.  *See Lillback ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005).  Thus, the usual summary judgment considerations, of whether material factual disputes exist, are not employed; rather, the court "must engage in an independent review of the administrative record and make a determination based upon a preponderance of the evidence[.]"  *Hardison v. Bd. of Educ. of the Oneonta City Sch. Dist.*, 773 F.3d 372, 385–86 (2d Cir. 2014) (internal quotations and citations omitted).  That independent review, however, is not without significant limitations.  "The role of the federal courts in reviewing state education decisions under the IDEA is circumscribed."  *C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 77 (2d Cir. 2014).  The standard of review "requires a more critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete *de novo* review."  *Id.* (quoting *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 244 (2d Cir. 2012)).  The SRO has special expertise in educational matters involving the IDEA and its decisions, when "thorough and well-reasoned," are entitled to deference.  *T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 419 (2d Cir. 2009).

Under this deferential review, "[w]here the IHO and SRO disagree," a federal court will "defer to the reasoned conclusions of the SRO as the final state administrative determination."

*C.F.*, 746 F.3d at 77 (citation omitted).  "However, where the SRO's determinations are insufficiently reasoned to merit deference," or when "considering an issue not reached by the SRO," the reviewing court "should defer to the IHO's analysis." *Id.* (citation omitted).  "District courts are not to make subjective credibility assessments, and cannot choose between the views of conflicting experts on controversial issues of educational policy in direct contradiction of the opinions of state administrative officers who had heard the same evidence." *M.H.*, 685 F.3d at 240 (alterations and internal quotation marks omitted) (citing *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 383 (2d Cir. 2003)).

Different types of findings are also accorded different degrees of deference.  The SRO's findings regarding the IEP's substantive adequacy command more deference than determinations regarding whether the IEP was developed according to proper IDEA procedures.  *See M.H.*, 685 F.3d at 246; *see also M.P. v. Carmel Cent. Sch. Dist.*, No. 15 CIV. 3432 (VB), 2016 WL 379765, at *4 (S.D.N.Y. Jan. 29, 2016) ("Courts should afford more weight to SRO determinations when they involve the substantive adequacy of an IEP.").  Determinations of appropriate methodology are accorded greater deference, while factual determinations of progress are afforded less.  *See M.H.*, 685 F.3d at 246.  Finally, more deference is due when this Court's determination rests solely on the same evidence presented to the SRO.  *Id.*

It is with all these standards in mind, and having considered the parties' positions on deference,[8] that the Court approaches the findings, reasoning, and persuasiveness of the SRO's

---

[8] The parties both agree a court will afford some level of deference to the hearing officers.  They disagree, however, as to the amount of deference owed in the present action.  The Parents suggest the Supreme Court's recent decision, *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988 (2017), alters the Second Circuit's "thorough and well-reasoned standard."  The Supreme Court's decision, the Parents argue, requires the hearing officer (and school authorities) to offer a "cogent and responsive" "explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances."  (Pls. Mem. at 24.)  The District argues that the administrative decisions should be afforded deference, especially "on matters involving educational expertise."  (Def. Mem. at 13.)

decision as to each of the issues below.

## II.    IDEA Claims

Plaintiffs seek review of the SRO's decision that denied them tuition reimbursements for N.R.'s placement at Winston for the 2017–2018 and 2018–2019 school years.

Under the *Burlington/Carter* test, "[t]he Court may require the school district reimburse parents for their expenditures for private school educational services obtained for a student by the parents, if (1) the services offered by the district were inappropriate, (2) the services selected by the parent were appropriate, and (3) equitable considerations support the parent's claim." *E.S. ex rel. B.S. v. Katonah-Lewisboro Sch. Dist.*, 742 F. Supp. 2d 417, 443 (S.D.N.Y. 2010), *aff'd*, 487 F. App'x 619 (2d Cir. 2012).

Prong one of the *Burlington/Carter* test involves both a procedural and substantive inquiry: "(1) whether the student's IEP was developed according to the IDEA's procedural requirements, and (2) whether the educational plan set forth in the IEP was reasonably calculated to confer educational benefit on the student." *M.P.G. ex rel. J.P. v. N.Y.C. Dep't of Educ.*, No. 08 CIV. 8051 (TPG), 2010 WL 3398256, at *2 (S.D.N.Y. Aug. 27, 2010) (citing *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998)); s*ee P.K. ex rel. S.K. v. N.Y.C. Dep't of Educ. (Region 4)*, 819 F. Supp. 2d 90, 105 (E.D.N.Y. 2011), *aff'd, appeal dismissed*, 526 Fed. App'x. 135 (2d Cir. 2013) ("A procedural violation generally concerns the process by which the IEP and placement offer was developed and conveyed; on the other hand, a substantive violation arises from a deficiency in the programming being offered."). "Under the IDEA, if a procedural violation is alleged, an administrative officer may find that a student did not receive a FAPE only if the procedural inadequacies (a) impeded the student's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a

FAPE to the student, or (c) caused a deprivation of educational benefits." *M.P.G.*, 2010 WL 3398256, at *2 (citing 20 U.S.C. § 1415(f)(3)(E)(ii) and 34 C.F.R. § 300.513(a)(2)).  In the event a court determines that the services offered by the school district were appropriate under the first prong of the *Burlington/Carter* test, it need not reach the second prong (appropriateness of parents' placement) or the third prong (equities).  *See Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 364 (2d Cir. 2000).

The Parents raise both procedural and substantive challenges to N.R.'s IEPs for the 2017–2018 and 2018–2019 school years.  As the Parents initiated review of the SRO's decision, they bear the burden of persuasion as to the inappropriateness of the IEPs.  *See B.K. v. New York City Dep't of Educ.*, 12 F. Supp. 3d 343, 356–57 (E.D.N.Y. 2014) (citing *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009)).

## A.    Compliance With IDEA's Procedural Requirements

The Parents seek reversal of the SRO's finding that the District did not commit procedural violations in developing N.R.'s IEPs.  In particular, the Parents allege the SRO erred in not finding that the District (1) failed to discuss annual goals at the April 2017 and 2018 Meetings; and (2) predetermined the IEP and N.R.'s placement.  (*See generally* Pls. Mem., Pls. Reply, and Pls. Opp'n.)  The District maintains that it complied with its procedural obligations under IDEA.  (*See generally* Def. Mem., Def. Reply, and Def. Opp'n.)  Each alleged procedural violation will be addressed in turn.

### 1.    *Discussion of Annual Goals*

The IDEA mandates that school districts allow parents "to participate in meetings with respect to the identification, evaluation, and educational placement of the child."  20 U.S.C. § 1415(b)(1).  In addition, federal and state regulations require school districts to ensure parents are

given an opportunity to participate in their child's IEP meetings.   34 C.F.R. § 300.322; 8 N.Y.C.R.R. § 200.5(d).  Parents' disagreement with a district's proposed IEP, however, does not deny meaningful participation.  *See F.L. v. Bd. of Educ. of Great Neck Union Free Sch. Dist.*, 735 F. App'x 38, 40 (2d Cir. 2018) ("[A] professional disagreement is not an IDEA violation.").  Put differently, "as long as the parents are listened to," the school district does not violate the parents' right to meaningfully participate in their child's IEP meeting—"even if the [district] ultimately decides not to follow the parents' suggestions."  *E.F. v. N.Y.C. Dep't of Educ.*, No. 12 CIV. 2217 (MKB), 2013 WL 4495676, at *17 (E.D.N.Y. Aug. 19, 2013) (citing *Dirocco ex rel. M.D. v. Bd. of Educ. of Beacon City Sch. Dist.*, No. 11 CIV. 3897 (ER), 2013 WL 25959, at *20 (S.D.N.Y. Jan. 2, 2013)).  In sum, the IDEA grants parents the right to provide "input" regarding the development of their child's IEP.  *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 420 (2d Cir. 2009). The IDEA, however, does not grant parents "veto" power to reject the components of the IEP with which they disagree.  *Id.*

The Parents argue the CSEs failed to discuss goals at the April 2017 and 2018 Meetings (Compl. at ¶¶ 67, 94), thus depriving the Parents of the opportunity to meaningfully participate in development of N.R.'s IEPs.  The Court analyzes each meeting below.

### a.   *April 2017 Meeting and 2017-2018 IEP*

The CSE convened in April 2017 to develop an IEP to address N.R.'s needs for the 2017– 2018 school year.  (*See supra* Background, I.A.2.)  The Parents claim the IEP's goals were "perfunctorily" discussed at the April 2017 Meeting.  (Pls. Mem. at 7.)  "It is inconceivable," conclude the Parents, how the lack of discussion "did not prevent parent participation" and "affect the [District's] ability to provide a FAPE."  (*Id.* at 7.)  The Parents further argue the CSE "never matched up," or explained, how the goals advanced N.R.'s "academic achievement and learning

characteristics," "social development," "physical development," and "managerial or behavioral needs." (*Id.* at 8) (quoting *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107–08 (2d Cir. 2007)). The District argues the goals were discussed and the Parents "actively participated in the CSE meetings." (Def. Opp'n at 18.) The District further argues the CSE considered "sufficient evaluative information" in developing the goals. (*Id.* at 17.)

The IHO "hardly consider[ed]" the discussion of goals to constitute a "discussion"; instead, the IHO explained that the goals were presented in a "fait accompli" manner "with little interchange" between meeting participants. (IHO Decision at 39.) As a result, the IHO concluded the "perfunctory manner in which [the goals] were addressed" and "*when they were addressed*" "prevented the Parents from actively and meaningfully developing goals which they could endorse." (*Id.* at 40) (emphasis in original.) The SRO disagreed. The SRO observed that the Parents attended (and "actively participated" at) the April 2017 Meeting with legal counsel and N.R.'s one-on-one teacher from Winston. (SRO Decision at 10–11.) Upon review of the meeting's audio recording, the SRO did not characterize the presentation of goals as "fait accompli." (*Id.* at 11.) The CSE did not finalize the goals before presenting them to the Parents. Instead, the SRO found Mr. Feller "presented his views of what goals would address the student's needs as described during the meeting and no member of the CSE including the parents offered a different view or objected to [Mr. Feller's] characterization." (*Id.*) The SRO concluded the evidence did not support the IHO's finding that "the district denied the parents meaningful participation at the April 2017 CSE meeting or that the district failed to have an open mind with respect to the development of the annual goals included" in the IEP. (*Id.* at 11-12.)

Where the IHO and SRO disagree, the district court first defers to the SRO so long as the SRO's decision is not too "insufficiently reasoned to merit deference." *C.F. ex rel. R.F. v. New*

*York City Dep't of Educ.*, 746 F.3d 68, 77 (2d Cir. 2014) (citation omitted) (directing a court to defer to the IHO where an SRO's analysis fails muster).  Finding sufficient reasoning in the SRO's decision, this Court gives due deference to the SRO's thorough and well-reasoned analysis.  After careful review of the record, this Court agrees with the SRO that the record does not support a finding that the District denied the Parents meaningful participation at the April 2017 Meeting. The Parents attended the meeting alongside counsel and Ms. Bennedum, N.R.'s teacher from Winston.  (C.R. Ex. D-1 at 1.)  Ms. Bennedum described N.R.'s strengths and weaknesses, including areas for improvement.  (*Id.* at 1–2.)  Based on N.R.'s areas for improvement, Ms. Michaels, the District's psychologist, identified goals for N.R. that would "focus on interacting appropriately when frustrated, managing social situations, and working on interactions with other students."  (*Id.* at 2.)  The annual goals were later "reviewed and updated," (*Id.* at 3), and as the SRO observed, the audio recording reflects that Mr. Feller explained "what goals would address the student's needs as described during the meeting."  (SRO Decision at 11.)

The Parents do not disagree: A.R., N.R.'s mother, testified that the goals indeed were discussed and she initially had "no opinion" about them.  (C.R. Tr. 590:23–591:11 (A.R.).)  But the Court cannot fault the District for the Parents not offering more input on the annual goals.  *See E.A.M. v. N.Y.C. Dep't of Educ.*, No. 11 CIV. 3730 (LAP), 2012 WL 4571794, at *8 (S.D.N.Y. Sept. 29, 2012) (affirming SRO decision where SRO reversed IHO and found the record showed a parent meaningfully participated "despite her decision to remain mostly a listener at the meeting" (internal quotations omitted)).  That is especially true where the Parents *did* actively participate throughout the meeting, offering their concerns related to assistive technology, the behavior reward system, classroom size, classroom ratios, and stigma.  (*See generally* C.R. Ex. D-1 at 1–4.) "While a more specific discussion of goals at the CSE meeting may have been desirable," *see*

*E.A.M.*, 2012 WL 4571794, at *8 (finding a general discussion of goals was sufficient, especially where the CSE addressed how the IEP would align with the student's strengths and weaknesses), the record does not support the conclusion that the District failed to address the 2017–2018 IEP's goals.  Accordingly, this Court affirms the SRO's finding.

### b.      April 2018 Meeting and 2018–2019 IEP

The CSE convened in April 2018 to develop N.R.'s 2018–2019 IEP.  (*See supra* Background, I.A.3.)  The Parents claim the IEP's goals were "not discussed" during the meeting, thus "mak[ing] the IEP on its face inappropriate."  (Pls. Mem. at 17.)  The District disagrees.  Even if the goals were not discussed, the District observes that both parties agree the CSE considered sufficient evaluative information and that the Parents, their consultants, and Winston staff all actively participated in the meeting.  (Def. Opp'n at 17-19.)

The IHO found that "no substantive discussion of the student's goals" took place during the April 2018 Meeting.  (IHO Decision at 45.)  As such, the IHO concluded that "the Parents were excluded from a dialogue in which they could express their interest in specific academic and social/emotional objectives for their son during the 2018–2019 school year.  (*Id.*)  The SRO disagreed with the IHO's finding.  Although the SRO acknowledged that "specific annual goals included in the April 2018 IEP were not discussed," the SRO explained that the hearing record revealed discussions at the meeting regarding N.R.'s "areas of continuing need."  (SRO Decision at 17.)  The SRO found the parents attended and actively participated in the meeting.  (*Id.*)  They were accompanied by Winston's dean, a private psychiatrist, and an educational consultant.  (*Id.*)  Together, they provided the CSE "information about [N.R.'s] then-current needs and progress during the 2017-2018 school year."  (*Id.*)

The Court again finds the SRO decision sufficiently reasoned, and the Court defers to the SRO's thorough and well-reasoned analysis.  The Court also finds, on its own review of the record, that the Parents were not denied a meaningful opportunity to participate in the April 2018 Meeting.  Although the Court agrees with the IHO and SRO that specific goals were not discussed at the meeting, the hearing record contains ample evidence that the meeting included extensive discussions about N.R.'s areas of continuing need and the District's plans to address these needs.  The Parents and Mr. Yannotti (Winston's dean) described N.R.'s improvements both academically and socially, as well as N.R.'s areas of continuing need.  Mr. Yannotti identified "writing," "decoding skills," and "reading fluency/accuracy" as areas for academic improvement, and he identified "better navigat[ing] cooperative learning situations with peers" and "improv[ing] self-monitoring of off-topic comments" as areas for social improvement.  (C.R. Ex. D-2 at 2.)  Based on Mr. Yannotti's testimony, "updated goals" were designed to "address these areas." (*Id.*)  Ms. Lovallo, a District psychologist, also acknowledged the comments of the Parents and Mr. Yannotti, and as a result, she recommended specific individual and group-based counseling services to improve N.R.'s "social pragmatic skills." (*Id.* at 4.)  In the impartial hearing, Ms. Lovallo testified that "goal areas" were discussed, such as "social decision making," "social skills," and "math fluency."  (C.R. Tr. 486:10–15 (Lovallo).)   The record is clear: the Parents attended and participated in the meeting, and the District considered feedback from the Parents and the Parents' consultants in developing N.R.'s IEP.  The Court thus agrees with the SRO: "any failure to discuss the particular annual goals included in the April 2018 IEP at the CSE meeting did not significantly impede the parents' opportunity to participate in the development of the student's IEP or demonstrate that the district failed to have an open mind with respect to the annual goals."  (SRO Decision at 18.)  Accordingly, this Court affirms the SRO's finding.

## 2.     Predetermination

"Predetermination of a child's IEP amounts to a procedural violation of the IDEIA if it deprives the student's parents of meaningful participation in the IEP process." *B.K. v. N.Y.C. Dep't of Educ.*, 12 F. Supp. 3d 343, 356–57 (E.D.N.Y. 2014) (collecting cases). "The core of the statute is that the development of the IEP be a cooperative process between the parents and the district, and predetermination by a district of a child's IEP undermines the IDEA's fundamental goal to give parents a voice in the educational upbringing of their children." *J.G. ex rel. N.G. v. Kiryas Joel Union Free Sch. Dist.,* 777 F. Supp. 2d 606, 648 (S.D.N.Y. 2011) (internal quotation and citation omitted). Notably, "[c]ourts have rejected predetermination claims where the parents actively and meaningfully participated in the development of the IEP." *Id.* (collecting cases).

The Parents allege both the 2017–2018 and 2018–2019 IEPs were predetermined (Compl. at ¶¶ 82, 113) and deprived the Parents of meaningful participation in the IEP process. The Court analyzes each IEP (and respective Meeting) below.

### a.     April 2017 Meeting and 2017–2018 IEP

The Parents reiterate that the goals were "perfunctorily" discussed at the April 2017 Meeting. (Pls. Mem. at 9.) The Parents argue this lack of discussion "shows that at a minimum the goals were predetermined." (*Id.*) In addition to the "reading" and "recycling" of goals, the Parents claim the CSE determined N.R.'s teacher "well in advance" of the meeting.[9]

---

[9] The District argues that the Parents did not exhaust their appeal as it relates to the predetermination of N.R.'s eighth-grade teacher, Mr. Murphy. (Def. Reply at 6 n.3.) The Parents claim Mr. Murphy attended the April 2017 Meeting and "spoke about how he would address [N.R.'s] needs in his class. (Pls. Opp'n at 6) (citing C.R. Ex. D-1 at 2.) It appears to the Court that the District is correct: the Parents did not properly exhaust their appeal as it relates to Mr. Murphy. In their cross-appeal to the SRO, the Parents make no mention of the CSE pre-selecting Mr. Murphy as N.R.'s eighth grade teacher. (Pls. SRO Appeal at ¶¶ 1, 24–25.) Nonetheless, the Court rejects the Parents' argument. Both parties are "limited to discussing the placement and services specified in the written plan"; it is thus error to assess whether the District provided a FAPE based on whether "a specific teacher would have been assigned or because of actions that specific teacher would have taken beyond what was listed in the IEP." *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 187 (2d Cir. 2012) (explaining that no one can "guarantee that a particular teacher or aide will not quit or become otherwise unavailable for the upcoming school year"). The Court agrees with the SRO that the

(*Id.* at 9–10.)   The Parents also cite the extent to which the Parents' suggestions at the meeting were not incorporated in the IEP.   (*Id.* at 10.)   The District counters that the Parents, their consultants, and Winston staff submitted a "wealth of information" to the CSE regarding N.R.'s academic and social performance.   (Def. Reply at 5.)   The District further avers that the CSE prepared for the meeting but entered the meeting with "an open mind and ready to listen to the opinions of Plaintiffs and their consultants (including WPS staff)."   (*Id.* at 6.)   The Parents' argument, the District adds, "conflates a prospective teacher with the program offered in a student's IEP."   (*Id.* at 7.)

The IHO found "no evidence of predetermination," finding instead that the April 2017 Meeting was "long," "thorough," and "all-encompassing."   (IHO Decision at 47.)   The Parents "had every opportunity to share their concerns" with the District and "did so."   (*Id.*)   Although the District "offered an array of modifications and accommodations to facilitate a mainstream placement," the Parents objected "several times."   (*Id.*)   "This," according to the IHO, did not "equate with predetermination."   (*Id.*)   The SRO agreed.   The SRO found "no authority for the proposition that the relative consistency of a CSE's recommendations for a student over time amounts to predetermination," particularly where a student's needs have remained relatively consistent as well.   (SRO Decision at 10.)   But where N.R.'s needs had shifted, the SRO observed, the CSE incorporated modest changes to the IEP to better address his needs.   (*Id.*)   The SRO thus affirmed the IHO's finding as to predetermination of the 2017–2018 IEP.   (*Id.* at 11–12.)

Where the IHO and SRO agree, the district court's deference to the administrative proceedings is heightened.   *See L.L. v. N.Y.C. Dep't of Educ.*, No. 15 CIV. 4146 (JPO), 2016 WL

---

anticipation of staffing for the execution of an IEP does not alone equate to predetermination so long as the CSE "maintained an open mind regarding the student's program and placement."   (SRO Decision at 17) (rejecting predetermination argument as to the CSE's alleged advanced knowledge of N.R.'s ninth-grade teacher.)

4535037, at \*5 (S.D.N.Y. Aug. 30, 2016).  This Court therefore gives due deference to the SRO's thorough and well-reasoned analysis, in which the SRO upheld the IHO's finding.  Although the Court agrees with the Parents that the 2017–2018 IEP remained "very similar from year to year," (Pls. SRO Appeal at ¶ 18), it is well-established that "similarities between IEPs are not a basis for finding them to be inappropriate."  *A.R. on behalf of M.R. v. Katonah Lewisboro Union Free Sch. Dist.*, No. 18 CIV. 9938 (KMK), 2019 WL 6251196, at \*14 (S.D.N.Y. Nov. 21, 2019) (internal quotations omitted).  That is especially true where, as here, (1) the student's needs have remained relatively similar over time; (2) the District has modified the IEP to the extent the student's needs have changed; and (3) the District, the Parents, and non-school staff "all have participated in extensive discussions" in developing the IEP.  (*See generally* C.R. Ex. D-1; SRO Decision at 9–10.)  *Cf. A.R.*, 2019 WL 6251196, at \*13 (S.D.N.Y. Nov. 21, 2019).  Based on the foregoing, this Court affirms the SRO's finding.

### b.      April 2018 Meeting and 2018–2019 IEP

Both parties advance predetermination arguments largely tracking those for the April 2017 Meeting and 2017–2018 IEP.  *See supra* Discussion, II.A.2.a.  The Parents argue that the CSE had advanced knowledge of N.R.'s teacher for the 2018-2019 school year, therein evidencing predetermination of the IEP.  (Pls. Mem. at 17.)  The Parents also point to the "failure to discuss goals" at the April 2018 Meeting and the similarities between the goals listed in the 2017–2018 and 2018–2019 IEPs.  (*Id.* at 17–18, 18 n.11.)  The District again asserts the District considered the Parents' submitted information, prepared for the meeting, and remained open-minded to the Parents' feedback.  (Def. Reply at 5–6.)  The District reiterates that the Parents' argument "conflates" advanced knowledge of N.R.'s prospective teacher with impermissible predetermination of the IEP.  (*Id.* at 7.)

As it did for the 2017–2018 IEP, *see supra* Discussion, II(A)(2)(a), the IHO found "no evidence of predetermination." (IHO Decision at 47.) During the April 2018 Meeting, which the IHO characterized as "long," "thorough," and "all-encompassing," the CSE discussed with the Parents "several modifications, accommodations and classroom options." (*Id.*) These were later added to the IEP. (*See generally* C.R. Ex. D-2.) The IHO concluded, "[T]he Parents had a full and fair opportunity to discuss their son's educational planning and they did so." (IHO Decision at 47.) On appeal, the SRO reiterated that "the similarity of the program and placement alone does not establish predetermination, particularly since the April 2018 CSE adjusted the recommendations for the student compared to the year prior." (SRO Decision at 16.) The SRO also dismissed the Parents' argument that the CSE's alleged advanced knowledge of N.R.'s ninth-grade teacher constituted evidence of predetermination. (*Id.* at 17.) The SRO affirmed the IHO's finding on predetermination of the 2018–2019 IEP. (*Id.* at 18.)

The Court refuses to displace these findings by the SRO and IHO. The record makes clear the 2018–2019 IEP was not predetermined. As noted above, *see supra* at 29 n.9, the CSE's advanced knowledge of a student's prospective teacher does not amount to evidence of predetermination. Advanced knowledge of a prospective teacher is indicia of predetermination only to the extent the CSE did not have an "open mind" entering the meeting. *See T.P. ex rel S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 253 (2d Cir. 2009). The April 2018 Meeting bears numerous examples of the CSE's open-mindedness. (*See* IHO Decision at 47) (listing modifications to IEP developed at meeting.) For example, after N.R.'s parents expressed their desire for N.R. to gradually transition into a "mainstream" educational experience, the CSE recommended an Integrated Co-Teach science class. (C.R. Ex. D-2 at 5.) The class provided "hands-on" lab opportunities and focused, individualized learning in a "mainstream" class co-

taught by a general education teacher and a special education teacher. (*Id.* at 4–5.) After hearing from Mr. Yannotti about N.R.'s interest in science, Mr. Feller suggested N.R.'s excitement for the subject and the course's co-teach structure could facilitate an entry point into a "mainstream" education. (*Id.* at 5.) To receive feedback and thus ensure the program adjusted to N.R.'s needs in real time, the CSE also incorporated regular meetings with the Parents into the IEP. (*Id.*) Exercising deference to the IHO and SRO and undertaking its own independent inquiry, this Court finds the 2018-2019 IEP was not predetermined. Accordingly, the Court affirms the SRO's finding.

### B. Substantive Adequacy of the IEPs

Having determined the violations of procedural safeguards did not deny N.R. a FAPE, the Court now turns to the substantive inquiry. *See Y.A. v. N.Y.C. Dep't of Educ.*, No. 15 CIV. 05790 (CM), 2016 WL 5811843, at *7 (S.D.N.Y. Sept. 21, 2016). A school district complies with IDEA's substantive requirements if a student's IEP is "reasonably calculated to enable the child to receive educational benefits." *Id.* (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 206–07 (1982)). Any substantive inadequacy in a student's IEP results in the denial of a FAPE. *See M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 143 (2d Cir. 2013). "An IEP is substantively adequate if it 'provide[s] personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction.'" *D.D-S v. Southold Union Free Sch. Dist.*, No. 09 CIV. 5026 (JS) (WDW), 2011 WL 3919040, at *11 (E.D.N.Y. Sept. 2, 2011) (quoting *Rowley*, 458 U.S. at 203), *aff'd*, 506 Fed. App'x 80 (2d Cir. 2012). Questions of an IEP's substantive adequacy are ones in which "substantial deference is owed to the judgments of state administrative officers." *Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 450 (2d Cir. 2015); *also C.R. v. N.Y.C. Dep't of Educ.*, 211 F. Supp. 3d 583, 609

(S.D.N.Y. 2016) (collecting cases).

The Parents alleged the goals listed in the IEP for the 2017–2018 school year "remained largely the same" from the 2016–2017 IEP and "continued to lack specificity and measurable tests and assessments to provide meaningful progress." (Compl. at ¶ 66.) The Parents likewise alleged the goals listed in the 2018–2019 IEP "were not appropriate." (*Id.* at ¶ 94.) The goals, according to the Parents, "were not specific and the measurements for achieving those goals were not defined." (*Id.* at ¶¶ 76, 107.)

"The IDEA requires that a student's IEP include 'a statement of measurable annual goals, including academic and functional goals, designed to ... enable the child to ... make progress' and 'meet each of the child's other educational needs that result from the child's disability.'" *L.O. v. N.Y.C. Dep't of Educ.*, No. 15-1019, 2016 WL 2942301, at \*15 (2d Cir. May 20, 2016) (quoting 20 U.S.C. §§ 1414(d)(1)(A)(i)(II)(aa) & (bb)). "In this Circuit, courts are 'reluctant to find a denial of a FAPE based on failures in IEPs to identify goals or methods of measuring progress.'" *J.L. v. City Sch. Dist. of City of New York*, No. 12 CIV. 1516 (CM), 2013 WL 625064, at \*13 (S.D.N.Y. Feb. 20, 2013) (citing *R.R. v. Scarsdale Union Free Sch. Dist.*, 615 F. Supp. 2d 283, 295 (S.D.N.Y. 2009)).

### 1.    *2017–2018 IEP*

The Parents claim the goals listed in the 2017–2018 IEP were "largely copied into the new IEP" from the 2016–2017 IEP. (Pls. Mem. at 12.) The new goals, the Parents argue, were "simply not measurable," precluding "any ability to calculate NR's performance" because the goals were "based on amorphous measures." (*Id.*) The Parents assert the goals were "merely recycled" and did not "incorporate[]" "NR's improvement." (*Id.* at 13.) The District points to the hearing record to "establish[ ] that the goals in NR's IEPs were developed based on his then-present levels of

functioning (academically and socially), the progress he had made in prior years, where he continued to need support, grade level, and his desire for meaningful friendships." (Def. Mem. at 19.)

The IHO concluded that the 2017–2018 goals were "repetitious," "insufficient," and "unquantifiable." (IHO Decision at 39.) The IHO found that many of the goals were a "word for word transposition of goals from the 2016–2017 IEP," and as such, the "transposed" goals "militate[d] against any consideration of the student's actual needs and levels of performance." (*Id.* at 38.) These "broad" goals offered "few specifics" and, "[c]onsequently," "little accountability in terms of meeting annual expectations." (*Id.* at 39.) Moreover, the IHO characterized the goals as "poorly drafted," "easily applicable to any student in N.R.'s class," and "unquantifiable." (*Id.*)

The SRO, however, found the evidence in the hearing record did not support the IHO's conclusion. At the outset, the SRO described the 2017 progress report received from Winston. (SRO Decision at 12.) The progress report identified a host of *continuing* needs, and Ms. Bennedum reiterated these needs during the April 2017 Meeting. (*Id.*) Based on N.R.'s continuing needs, the CSE carried over seven goals from the prior IEP, modified language or criteria for five, and added one new goal. (*Id.*) The SRO then discussed the goals for each subject area, describing first N.R.'s continuing needs in that area and then explaining how the goals and criteria were retained or modified from the 2016–2017 IEP to account for N.R.'s needs. (*See generally id.* at 13–15.) For example, N.R.'s teachers observed he "demonstrated a strong understanding of foundational skills" in math but that "problem solving was still an area in which the student required specific support." (*Id.* at 13.) The IEP stated that N.R. needed to learn strategies to strengthen his problem-solving skills; in particular, the IEP recommended "analyzing multi-step

word problems, identifying operations, and identifying the sequential steps required to plan an approach for the solution." (*Id.*)  As a result, the IEP retained a goal involving the use of inverse operations "to solve one and two step equations algebraically." (*Id.*)  The SRO conducted a similar analysis for each category of goals: math, writing, reading, study skills, and social development. (*See generally id.* at 13–15.)  After conducting a thorough analysis of each category, the SRO concluded that "a review of the annual goals as compared to the present levels of performance in the [2017–2018 IEP] demonstrates that the goals aligned with the student's identified needs." (*Id.* at 15.)  On the question of substantive adequacy, this Court gives substantial deference to the judgments of the state administrative officers.  *See Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 450 (2d Cir. 2015).  Having reviewed the record and the SRO's discussion on the 2017-2018 IEP goals (SRO Decision at 12–16), the Court agrees with the SRO that the record does not support a finding that the goals were inappropriate.

The appropriate inquiry, as the SRO suggests, is not whether the IEP carried over goals from a previous year, but rather if the goals aligned with N.R.'s identified needs.  *See M.B. v. City Sch. Dist. of New Rochelle*, No. 17 CIV. 1273 (KBF), 2018 WL 1609266, at *15 (S.D.N.Y. Mar. 29, 2018).  "[T]o the extent certain goals and objectives were repeated," the record does not suggest "laziness or incompetence" on the part of the CSE.  *Id.*  Instead, it clearly shows the District was "actively and estimably engaged in continuously evaluating and analyzing [N.R.'s] special education needs and designing goals and objectives calculated to enable [N.R.] to make appropriate progress." *Id.*  Relying upon progress reports from Winston and extensive discussion at the annual review, the IEP tracked N.R.'s present levels of performance and areas of continuing need.  (*See generally* C.R. Ex. D-1.)  It then articulated goals designed to address those areas of continuing need.  In math, for example, N.R. struggled with problem-solving, and the IEP aimed

36

to equip N.R. with strategies for breaking down multi-step problems.  (SRO Decision at 13.)  One such strategy was identifying the operations and sequential steps required to solve a multi-step problem; as a result, the IEP listed an annual goal targeting the use of inverse operations.  (*Id.*) Another example was a new goal added to address N.R.'s social development.  Based on teacher reports and comments by Ms. Bennedum at the April 2017 Meeting, the CSE added a new goal which called for N.R. to "foster and maintain 2 positive relationships with peers" over each assessment period.  (C.R. Ex. D-2 at 1–2, 13; SRO Decision at 14–15.)  The goal was added because, according to Ms. Bennedum, N.R. "sometimes has difficulty navigating certain social situations [and] misread[s] certain social cues." (C.R. Tr. 64:25–65:12 (Bennedum).)  As the SRO reasoned, each goal was responsive to N.R.'s continuing needs, and their consistency over time reflects nothing other than the relative consistency of N.R.'s needs.[10]  *See, e.g., J.C.S. v. Blind Brook-Rye Union Free Sch. Dist.*, No. 12 CIV. 2896 (CS), 2013 WL 3975942, at *12 (S.D.N.Y. Aug. 5, 2013) ("To the extent there is some similarity between goals from year to year, such continuity makes sense. Modeling an IEP after the prior year's IEP, with appropriate changes, is a sensible practice that, as long as it is not done reflexively and without consideration of the student's individual circumstances and needs, does not signify that the student is likely to regress.").

Based on its independent review of the record, and with substantial deference given to the SRO's findings, this Court concludes that the preponderance of the evidence does not support a finding that the annual goals in the 2017–2018 IEP were substantively inadequate.  Accordingly, the Court agrees with the SRO and concludes that no FAPE was denied for the 2017–2018 school year.

---

[10] Winston recommended the same annual goals for the 2017–2018 school year after the 2016–2017 school year in which N.R. did not achieve all of his goals in the areas of writing, reading, math, and social development. (C.R. 1066:13–1070:25; 1078:4–1079:23 (Bennedum).)  The carry-over of goals reflected the staff's determination that N.R. had several areas of continuing need.  (*Id.*)

## 2.    *2018–2019 IEP*

Like the 2017–2018 IEP goals, the Parents argue the 2018–2019 IEP goals "were not specific" and lacked adequately-defined measurements to assess N.R.'s achievement.  (Pls. Mem. at 17.)  In particular, the Parents assert the measurements relied on "amorphous," non-"standard" assessments, such as "portfolio materials, recorded observations and structured interviews."  (*Id.*)  The District repeats that the 2018–2019 goals were "substantively appropriate as they were drafted in accordance with [N.R.'s] needs both academically and otherwise."  (Def. Mem. at 19.)  These goals were only formed, according to Defendant, after "substantial discussion" with the Parents, their consultants, and Winston staff, including an "extensive review of various reports and assessments."  (*Id.* at 18.)

The IHO found the 2018-2019 IEP goals represented a "reflexive" and "automatic" "transposition of goals from one IEP to another."  (IHO Decision at 45.)  The IHO characterized the goals as "generic," and the IHO encouraged the District to identify repetitive goals as a "signal" to "reassess, redraft and re-define educational objectives and student needs."  (*Id.*)  The answer, the IHO explained, "does not lie in repeating the same goals from year to year."  (*Id.*)  The IHO concluded that although "courts have held that a clear similarity between IEPs does not translate into an absence of FAPE," here the CSE did not incorporate appropriate changes.  (*Id.*) (citing *AR on behalf of MR v. Katonah Lewisboro Union Free Sch. Dist.*, No. 18 CIV. 9938 (KMK), 2019 WL 6251196 (S.D.N.Y. Nov. 21, 2019).)

The SRO again disagreed, finding instead that the evidence in the hearing record did not support the IHO's conclusion that the annual goals in the 2018–2019 IEP were inappropriate.  The SRO explained that the CSE had received "quite a bit of documentation" from Winston, as well as evaluations and parental input.  (SRO Decision at 19.)  The materials, which the IHO concluded

were sufficient (*see* IHO Decision at 43), described N.R.'s continuing needs.  (SRO Decision at 19.)  Based on N.R.'s continuing needs, the CSE developed a set of goals: seven of which were carried over from the previous IEP, four of which modified the language or criteria of existing goals, and seven of which were new.  (*Id.* at 19.)  As it did for the 2017–2018 IEP goals, the SRO reviewed each goal category, identifying N.R.'s continuing needs (as defined by the IEP) and aligning them with the goals designed to address those needs.  (*See generally id.* at 19–21.)  After conducting a thorough analysis of each category, the SRO concluded that (1) "the goals aligned with the student's needs and appropriately reflected the student's progress," (2) "the district had still not implemented the goals carried over from the prior IEPs given the parents' unilateral placement of the student at Winston Prep," and (3) "information before the CSE described several of the student's areas of need as continuing relative to the prior school year."  (*Id.* at 21.)  The Court considers the SRO's analysis thorough and well-reasoned, and it affords substantial deference to the SRO's educational expertise.  Upon its own review of the hearing record, the Court also agrees with the SRO's finding.

As explained by the SRO's decision, the IEP goals were developed based on N.R.'s academic and social performance, recent progress, and continuing needs.  For example, the 2018–2019 IEP reported that N.R. struggled with "time management, problem solving and organization." (C.R. Ex. D-2 at 13.)  As a result, and accounting for N.R.'s transition to high school, the CSE added five new, specific goals targeting study skills.  (*See id.* at 16–17.)  These goals included organizing personal materials in binders, using a daily planner, creating graphic organizers prior to beginning complex tasks, learning and demonstrating new strategies for completing assignments (*e.g.,* homework), and using graphic organizers to take written notes during lessons across academic settings.  (*Id.*)  These goals were specifically targeted to address N.R.'s continuing needs.

(C.R. Tr. 90:20–91:7 (Feller)) ("[W]e needed to be very specific about what [N.R.] would need that would help him be successful in navigating being in a . . . public high school environment, and we had quite a bit of documentation from his school, from the evaluations and parental input about the types of things that would be helpful to him and we translated that into goals.")

Although this Court does not adopt the IHO's finding, it acknowledges that the IHO is correct to suggest "the wide repetition of IEP goals from year to year should signal educators to reassess, redraft, and re-define educational objectives and student needs." (IHO Decision at 45.) An IEP, however, is not inappropriate "simply because it does not change significantly on an annual basis." *P.C. v. Rye City Sch. Dist.*, 232 F. Supp. 3d 394, 414 (S.D.N.Y. 2017) (internal citation omitted).[11] More importantly, this Court finds that the CSE engaged in a thorough "reassessment" of N.R.'s needs based upon an extensive amount of evaluative materials received from Winston, experts, and N.R.'s parents. (*See, e.g.,* IHO Decision at 41–43; *see generally* C.R. Ex. D-2.) This reassessment, including the April 2018 Meeting, resulted in a refined set of goals and services for the 2018–2019 IEP. These goals and services were similar, but not the same as those included in the 2017-2018 IEP. (*Compare* C.R. Ex. D-2 at 16–18 *with* C.R. Ex. D-1 at 11–13.) As the SRO concluded (SRO Decision at 21), these goals were tailored to N.R.'s "individual circumstances and needs." *See, e.g., J.C.S. v. Blind Brook-Rye Union Free Sch. Dist.*, No. 12-CV-2896 CS, 2013 WL 3975942, at *12 (S.D.N.Y. Aug. 5, 2013).

Based on its independent review of the record, and with substantial deference given to the SRO's findings, this Court again concludes that the preponderance of the evidence does not support a finding that the annual goals in the 2018–2019 IEP were substantively inadequate.

---

[11] Because N.R. has not attended a District school under a recent IEP, it is premature (and inaccurate) to suggest the IEP is "repeating vague goals which do not lead to success," (IHO Decision at 41). *Cf. P.C. v. Rye City Sch. Dist.*, 232 F. Supp. 3d 394, 414 (S.D.N.Y. 2017) ("If a student made no progress under a particular IEP, using an *identical* IEP the following year would be questionable." (emphasis added)).

Accordingly, the Court agrees with the SRO and concludes that no FAPE was denied for the 2018–2019 school year.

### C.      N.R. Was Not Denied A FAPE

The Court finds that the SRO correctly determined that the District provided N.R. a FAPE for the 2017–2018 and 2018–2019 school years.  Accordingly, the Court need not decide whether his unilateral placement at Winston was appropriate, or whether equitable considerations favor the Parents' request for tuition reimbursement.  *See M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ.*, 226 F.3d 60, 66 (2d Cir. 2000) ("If the challenged IEP was adequate, the state has satisfied its obligations under the IDEA and the necessary inquiry is at an end.").  Because N.R. was not denied a FAPE for either school year, the Parents' request for tuition reimbursement is DENIED.  *See J.S. v. Scarsdale Union Free Sch. Dist.*, 826 F. Supp. 2d 635, 658 (S.D.N.Y. 2011) (citing *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir. 2005)) (explaining that "no reimbursement is permissible" where the court finds the state complied with IDEA procedures and the IEP was reasonably calculated to enable the child to receive educational benefits).

### CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is DENIED. Defendant's cross-motion for summary judgment is GRANTED.  The Clerk of Court is respectfully directed to issue judgment in favor of the Defendant.  The Clerk of Court is further directed to terminate the motions at ECF Nos. 24 and 30 and terminate this action.

Dated:    December 7, 2022                                SO ORDERED:
          White Plains, New York

                                          _____
                                                  NELSON S. ROMÁN
                                              United States District Judge